Richard **BRIDGES**, Plaintiff,

v.

John J. **CALLAHAN**, Acting Commissioner of Social Security, Defendant.

No. CV 96–5869(ADS).

United States District Court, E.D. New York.

Sept. 17, 1998.

Seelig & Ungaro, New York, NY by Philip H. Seelig, Of Counsel, for Plaintiff.

Zachary W. Carter, United States Attorney, E.D.N.Y., Brooklyn, NY by Sarah J. Lum, Assistant United States Attorney, for Defendant.

*MEMORANDUM OF DECISION
AND ORDER*

SPATT, District Judge.

The plaintiff, Richard Bridges ("Bridges" or the "plaintiff"), commenced this action pursuant to the Social Security Act, 42 U.S.C. § 405(g), seeking review of a final administrative determination of the Commissioner of the Social Security Administration (the "Commissioner") denying his application for social security disability insurance benefits. The plaintiff challenges the Commissioner's finding that the plaintiff was not "disabled" within the meaning of the Act, *see* 42 U.S.C. § 423(d)(1)(A), and that he is able to perform a substantially full range of sedentary work. The plaintiff and the defendant, John J. Callahan ("Callahan"), the Acting Commissioner of Social Security, have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## I. BACKGROUND

A. *Procedural History*

Bridges filed an application for Social Security disability benefits on April 25, 1994. (Transcript of Administrative Record ("Tr.") at 50–52, 84–89.) His application was denied, both initially on June 27, 1994, (Tr. at 71–73), and on reconsideration on December 5, 1994. (Tr. at 76–78.) Bridges filed a timely request for a hearing, which was held on September 13, 1995. (Tr. at 29–49.) On September 29, 1995, the Administrative Law Judge (the "ALJ") held that the plaintiff was not under a disability. (Tr. at 14–21.) The ALJ's decision became the final decision of the Commissioner when, on October 4, 1996, the Appeals Council denied the plaintiff's request for review. (Tr. at 3–4.) This appeal followed.

B. *Factual Background*

Bridges was born on November 9, 1945, and has a high school diploma and sixty college credits. (Tr. at 14, 19, 88.) The record reflects that Bridges was a New York City Police Detective for 23 years, until 1989, when he retired with a disability pension. (Tr. at 33–34, 118.) During his 23 years of service with the Police Department, the plaintiff sustained certain injuries to his lower back and to his left knee, including injuries sustained after being struck by a police vehicle while in pursuit of a fleeing felon. (Tr. at 84, 107, 113, 122.)

In May 1987, the plaintiff was examined by Dr. James Carr, an orthopedic and hand surgeon. (Tr. at 107–11.) An X-ray and CT scan revealed a left-sided herniated disc at L4–5 and a bulging disc at L3–4. (Tr. at 112.) Dr. Carr diagnosed the plaintiff with: multiple level post-traumatic disc disease at L3–S1 with evidence of disc herniation in the L4–L5 and L5–S1 region; radiculopathy of the left lower extremity in the L5–S1 region; and post-traumatic patellofemoral arthritic changes of the knee with meniscal derangement. (Tr. at 107–11.) On October 25, 1988, the plaintiff underwent operative arthroscopy, partial medial meniscectomy, interarticular shaving chonropasty, and abrasion arthroplasty. (Tr. at 116–17.)

On April 12, 1988, Dr. Murray E. Burton conducted an orthopedic examination of the plaintiff. (Tr. at 113–15.) Dr. Burton opined that Bridges was no longer able to fully function as a police officer. (Tr. at 115.)

In 1989, Bridges appeared before the Medical Board of the Police Pension Fund (the "Medical Board") on three occasions. (Tr. at 118–23.) Initial review of his request was deferred for four months. (Tr. at 122–23.) Upon re-examination and review of supporting documentation, the Medical Board concluded that the evidence did not substantiate a finding of permanent disability but deferred final decision for another four months pending re-examination. (Tr. at 121.) On October 2, 1989, the Medical Board concluded that, along with the new evidence and the plaintiff's prior medical records, Bridges had a permanent disability which would prevent the performance of full police duties, and approved his application for retirement. (Tr. at 119.) The Medical Board found that the plaintiff suffered from an internal derangement of the left knee. (*Id.*)

Following his disability retirement, the plaintiff worked as a private investigator and then as a security guard at a cemetery, until

July 22, 1993, the date he claims he became totally disabled and unable to work in any capacity. (Tr. at 50, 88, 92–97.)

The medical evidence after the alleged date of onset of permanent disability begins with an examination on June 9, 1994 by Dr. S.K. Dutta, a Social Security Administration Consultant. (Tr. at 124–125.) The plaintiff complained of persistent back and knee pain. Upon a physical examination, Dr. Dutta found the plaintiff, who stood 73 inches tall and weighed 230 pounds, to be well developed, well nourished, not in acute distress, and walking with a limp on the left side. (Tr. at 124.) Dr. Dutta noted that the plaintiff could stand, walk on his toes and heels, and squat without difficulty. (Tr. at 125.) However, the report does not state as to whether Bridges could sit, stand, or walk for repeated periods for any duration of time.

Dr. Dutta diagnosed Bridges with osteoarthritic degenerative disc disease of the lumbosacral spine with bulging and herniated discs, and osteoarthritic changes of the left knee, status post meniscectomy. (Tr. at 125.) The doctor further found that flexion and extension of the neck were limited to 20 degrees and that lateral rotation, which was performed to 35 degrees, was normal. The plaintiff had a full range of motion of the shoulders, elbows, and wrists. Wrist manipulation was normal. Straight leg raising was positive at 70 degrees bilaterally. Neurological examination of the lower extremities was unremarkable. With the exception of flexion of the left knee, which was limited to 90 degrees and painful, the range of motion of the knees and ankles was normal. Examination of the lumbosacral spine disclosed slight tenderness and moderate paraspinal muscle spasm with limitation of flexion and lateral bending/extension to 75 and 20 degrees, respectively. Based upon the results of his examination, Dr. Dutta concluded that the overall prognosis was unlikely to improve significantly and might deteriorate with time. (Tr. at 124–125.)

In addition, on June 9, 1994, Dr. H. Heimowitx, a radiologist and another Social Security Administration Consultant, observed the disc space narrowing at L4–L5 and L5–S1 of the plaintiff's lumbosacral spine. Examination of Bridge's left knee revealed neither acute fracture, dislocation, or effusion. However, the possibility of a loose body within the left knee joint could not be ruled out. (Tr. at 126.)

In August 1994, the plaintiff began treatment with Dr. Martin A. Lehman, an orthopedic surgeon. (Tr. at 104.) On August 23, 1994, upon the request of Dr. Lehman, Bridges underwent a Magnetic Resonance Imaging Scan ("MRI") of the lumbar spine. (Tr. at 131.) The MRI disclosed the presence of a small herniated disc at L4–L5 on the left side, predominantly involving the left neural foramen, degenerative disc disease from L3 to S1, and a Schmorl node involving L4. (Id.)

On September 12, 1994, Dr. Lehman performed another physical on the plaintiff, which revealed lumbosacral spine tenderness and muscle spasms. (Tr. at 129.) Flexion was restricted to 40 degrees; extension and lateral bending was limited to 30 degrees on the left, and 30 degrees on the right. Straight leg raising was positive to 30 degrees on the left, and 50 degrees on the right. Hypalgesia was experienced throughout the left thigh and leg. Dr. Lehman noted a slight depression of the left ankle jerk, but otherwise, motor strength was intact. (Tr. at 129.)

Dr. Lehman's examination of the plaintiff's left knee revealed tenderness around the patella and medial joint line. The range of motion extended from zero to 105 degrees with pain on flexion and rotation. There was some pain on grinding, but no overt instability. (Id.)

Dr. Lehman concluded that the plaintiff experienced acute and chronic acute recurrent sprain of the lumbosacral spine with radiculitis and nerve root irritation, along with a history of herniated discs in the left lower extremity. Additionally, status post arthroscopic surgery arthritic changes and synovitis were present in the left knee. (Id.) Dr. Lehman recommended conservative treatment along with pain killers and restricted activity, and advised MRI studies of the lumbar spine and an orthopedic follow-up. (Id.) He further noted that at his last

visit, the plaintiff was "markedly symptomatic" and unable to work. (Tr. at 130.)

On October 1, 1994, the plaintiff underwent an MRI of the cervical spine and cord. (Tr. at 134.) The MRI revealed bulging discs at C4–C5 and C5–C6, narrowing of the neural foramina at C5–C6 on both sides, but greater on the left, and degenerative facet disease at C4–C5 and C5–C6 on the left side. (*Id.*)

On November 4, 1994, September 12, 1995, and July 22, 1996, Dr. Lehman drafted updated reports, which do not reflect any change in the plaintiff's condition. (Tr. at 127–28, 132–33, 139–40.) All three reports indicate that Bridges continues to sustain marked and significant disabilities and limitations causally related to the on-the-job injury sustained while he was a police detective. Dr. Lehman further opined that the plaintiff's disabilities and limitations are permanent in nature due to the marked restriction in use of the cervical spine in both fine and gross motor co-ordination, and due to his inability to: do any squatting, bending, climbing; sit or stand for more than 10 to 15 minutes; and walk more than one block, and his ability to carry only 5 to 7 pounds. Dr. Lehman concluded that he saw no prospects for Bridges to be able to work in the future. (Tr. at 128, 133, 140.)

In November 1994, Social Security Administration Consultant Dr. Gowd diagnosed the plaintiff with discogenic disease of the cervical and lumbosacral spine, and noted that he could occasionally lift 20 pounds; frequently lift 10 pounds; stand, walk, or sit at least 6 hours in an 8–hour work day, but that push and pull was limited in the lower extremities and that he experienced occasional limitations with respect to climbing, balancing, stooping, kneeling, crouching, and crawling. (Tr. at 53–62.) Dr. Gowd concluded that Bridges was capable of performing light work. (Tr. at 62.) In June 1995, Social Security Administration Consultant Dr. Lick also noted that Mr. Bridges was capable of performing light work. (Tr. at 64.)

## C. *The Hearing*

On September 13, 1995, the plaintiff testified on his own behalf at a hearing before the ALJ. Bridges testified that he resides with his wife. (Tr. at 40.) On a good day, while his wife is at work, Bridges reads the papers, eats cereal, sits out on the deck in the summer, and waters the garden. (Tr. at 40–41.) He prepares meals in a microwave. (Tr. at 40.) Because his back is in constant pain, he sometimes lies down. (Tr. at 37, 41.) The pain discontinues when he's lying down. (Tr. at 37.) If he stands for a period of 15 minutes, his left leg goes numb. (Tr. at 37.) He is capable of remaining seated for only 20 minutes, or a half hour, at the most. (Tr. at 38.) Bridges did not think that he would be able to sit for a four-hour period, even if he was given the opportunity to stretch and stand at his desk every 15 minutes. (Tr. at 39.) A couple of times a month, for a continuous period of two or three days, Bridges has difficulty getting out of bed and is sometimes, immobile. (Tr. at 39.) Once in a while, his knee collapses, causing him to fall. (Tr. at 44–45.)

Occasionally, Bridges receives visitors and spends "a lot" of time on the telephone talking with former police colleagues. (Tr. at 45–46.) He occasionally drives to Brooklyn from Suffolk County to visit his mother. (Tr. at 46, 87.) However, on the day of the hearing, the plaintiff's wife drove him. The plaintiff is able to lift ten pounds. (Tr. at 46–47.)

The plaintiff testified that he was taking Motrin to relieve his pain. (Tr. at 47.) However, his doctor prescribed Flexeril, a stronger medication, when the pain increased. (*Id.*) No exercises were recommended for his back. (*Id.*)

## D. *The ALJ's Decision*

On September 29, 1997, the ALJ issued a written decision denying the plaintiff's application for benefits, finding "that the claimant was not under a 'disability', as defined in Section 223(d)(1)(A) of the [Social Security] Act, at any time through the date of this decision." (Tr. at 15–17.) After determining that the plaintiff's impairments preclude performance of past relevant work, the ALJ concluded that Bridges retains the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a). In

formulating his decision, the ALJ relied solely on the evidence presented by the plaintiff's treating physician, Dr. Lehman, the MRIs, and Dr. Dutta's report:

> The assessment of marginal physical capacities and opinion of employability repeatedly offered by Dr. Lehman, the claimant's treating orthopedist, as unsupported by medically acceptable clinical and laboratory diagnostic techniques and are inconsistent with other substantial evidence, i.e., the minimal clinical abnormalities demonstrated by the report of Dr. Dutta, a consulting surgeon who examined the claimant in June 1994, and the absence of pronounced cervical and/or lumbar disc herniation with significant nerve root compression upon magnetic resonance imaging of the cervical and lumbar spine in August and October 1994. Under such circumstances, Dr. Lehman's assessment of marginal physical capacities and opinion of unemployability are not controlling (20 CFR 404.1527(d)(2)). Based upon the results of the claimant's cervical and lumbar MRI's and the clinical findings reported by Dr. Lehman and Dr. Dutta, the Administrative Law Judge concludes that the claimant retains the residual functional capacity to perform sedentary work as hereinbefore defined. Such finding of ability to perform sedentary work, in the opinion of the Administrative Law Judge, is supported by the medical evidence and is consistent with the record as a whole (20 CFR 404.1527(d)(3) and (4)).

(Tr. at 18) (citations omitted). The ALJ discredited the plaintiff's testimony of incapacitating symptomatology:

> Such testimony of incapacitating symptomatology, including constant low back pain, pain and spasm in the neck, numbness in the leg, and occasional collapse of the left leg, is unsupported by the clinical and diagnostic evidence of record and, what is more, is incongruent with the claimant's testimony that he is able to spend much time talking on the telephone to friends and former co-workers each day and can drive an automobile to Brooklyn to visit his mother. Moreover, it is worthy of note that the claimant, again inconsistent with the presence of incapacitating symp-

tomatology, apparently was not under medical treatment from July 22, 1993 to August 15, 1994, the date he first saw Dr. Lehman after filing an application for disability insurance benefits on April 25, 1994 and retaining counsel on or about July 14, 1994. Having analyzed the claimant's testimony of incapacitating symptomatology within the evaluative framework of SSR 88–13, *supra,* and pursuant thereto, having given due consideration to such matters as the claimant's description of symptomatology, treatment, functional restrictions and daily activities, the Administrative Law Judge concludes that such testimony of incapacitating symptomatology is not credible. While the claimant may experience some subjective degree of pain, muscle spasm, and numbness with occasional collapse of the left knee, it is not of such severity, frequency and duration as to preclude performance of sedentary work.

(Tr. at 18–19.) The ALJ then performed the Commissioner's test for determining disability, as set forth in 20 C.F.R. §§ 404.1520, 416.920, and formally concluded that plaintiff was not entitled to disability benefits under the Act. (Tr. at 19–21.)

## II. DISCUSSION

### A. *Standard of Review*

▉ Judicial review of the denial of disability benefits is narrow. In examining the ALJ's decision, "[i]t is not our function to determine de novo whether [plaintiff] is disabled." *Schaal v. Apfel,* 134 F.3d 496, 500 (2d Cir.1998) (quoting *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir.1996)). Rather, the Court will set aside the Commissioner's conclusions only if they are not supported by substantial evidence in the record as a whole or are based on an erroneous legal standard. *Bubnis v. Apfel,* 150 F.3d 177, 180, 1998 WL 416809, at *2 (2d Cir. July 16, 1998); *Yancey v. Apfel,* 145 F.3d 106, 111 (2d Cir.1998); *Clark v. Commissioner of Social Security,* 143 F.3d 115, 118 (2d Cir.1998); *Schaal,* 134 F.3d at 501; *Beauvoir v. Chater,* 104 F.3d 1432, 1433 (2d Cir.1997); *see* 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla. It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (internal quotation marks and citation omitted). In evaluating the evidence, "[t]he Court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon a de novo review." *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir.1991); *see also Yancey,* 145 F.3d at 111.

■ Finally, the ALJ generally has an affirmative duty to develop the record in light of the non-adversarial nature of benefits proceedings. *Schaal,* 134 F.3d at 505. This duty exists even where, as here, the claimant is represented by counsel. *Id.*

It is under this framework that the Court evaluates the present social security appeal.

### B. *The Motions*

Federal disability insurance benefits are available to those individuals who are "disabled" within the meaning of the Act. *See* 42 U.S.C. § 423(a), (d). To be eligible for disability benefits under the Act, Bridges must establish his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Commissioner has promulgated a five-step analysis for evaluating disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920. As the Second Circuit has explained:

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.

If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the Regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual function capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform ... [T]he claimant bears the burden of proof as to the first four steps, while the [Commissioner] must prove the final one.

*DeChirico v. Callahan,* 134 F.3d 1177, 1179–80 (2d Cir.1998) (quoting *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982)); *see also Balsamo v. Chater,* 142 F.3d 75, 79–80 (2d Cir.1998); *Schaal,* 134 F.3d at 501.

In meeting the burden of proof on the fifth step, the Commissioner may rely on the medical vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the grids":

The grids take into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the grids indicate whether the claimant can engage in any other substantial gainful work which exists in the national economy. Generally the result listed in the grids is dispositive on the issue of disability. However, the grids are not dispositive where they do not accurately represent a claimant's limitations that significantly diminish her capacity to work.

*See Rodriguez v. Apfel,* No. 96 Civ. 8330, 1998 WL 150981, at *7 (S.D.N.Y. March 31, 1998) (citations omitted). The grids classify work into five categories based on the exertional requirements of the different jobs.

Specifically, it divides work into sedentary, light, medium, heavy, and very heavy, based on the extent of requirements in the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling.

In the present case, the ALJ performed the above five-part analysis, and his conclusions as to the first four steps are not in dispute. He found that the plaintiff was not employed, and that the plaintiff's injuries constituted a severe impairment that limited his capacity to work. The ALJ next determined that neither the plaintiff's impairment nor a medical equivalent was among those enumerated in Appendix 1, Subpart P, 20 C.F.R. Part 404, and accordingly, proceeded to determine whether the plaintiff retained residual functional capacity to perform his past work as a police detective. The ALJ found that the plaintiff was incapable of performing past relevant light, skilled work as a police detective and private investigator, but that the plaintiff did retain such residual functional capacity to perform unskilled sedentary work. It is as to this final determination that the plaintiff claims the ALJ erred, and on this portion of the ALJ's analysis that this Court will focus.

First, the plaintiff contends that the ALJ committed legal error by failing to give proper controlling weight to his treating physician, Dr. Lehman, as the Regulations require. Second, the plaintiff argues that the ALJ failed to evaluate his subjective complaints of pain properly. Third, the plaintiff maintains that the ALJ failed to meet his burden of demonstrating that he retains the residual function capacity to perform sedentary work.

■ The law gives special evidentiary weight to the opinion of the treating physician. Specifically, the regulations state that:

> Generally, we give more weight to opinions from your treating sources .... If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating

source's opinion controlling weight, we apply [various factors] in determining the weight to give the opinion.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Thus, "the opinion of a treating physician is not binding if it is contradicted by substantial evidence." *Gonzalez v. Chater*, No. 93 Civ. 7200, 1996 WL 442798, at *5 (S.D.N.Y. Aug.6, 1996) (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir.1983)), *aff'd*, 152 F.3d 918, 1998 WL 398809 (2d Cir. June 8, 1998). "In this regard, the report of a consultative physician may constitute substantial contrary evidence." *Id.* (citing *Mongeur*, 722 F.2d at 1039).

The Second Circuit has stated that the factors which must be considered when the treating physician's opinion is not given controlling weight include:

> (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist. In addition, the regulations provide that the agency "will always give good reasons in [its] notice of determination or decision for the weight [it] gives [claimant's] treating source's opinion."

*Clark*, 143 F.3d at 118 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)) (alterations in original); *see also Schaal*, 134 F.3d at 503–04 (citing same).

The Second Circuit recently had occasion to explore the ALJ's burden of proof of establishing a claimant's ability to perform sedentary work in *Balsamo v. Chater*, 142 F.3d 75 (2d Cir.1998), which analysis the Court finds to be instructive. In *Balsamo*, the Second Circuit vacated the district court's affirmance of the ALJ decision denying disability benefits and finding that the plaintiff could perform sedentary work. The plaintiff in *Balsamo* had a medical background similar to that of the plaintiff in the present case. Balsamo was a New York City Police Officer from 1985–1993, during which time he sustained a number of injuries. Following various work-related injuries including a car accident involving a suspect, Balsa-

mo was diagnosed by an orthopedic surgeon with back and left knee injuries. Three arthroscopic procedures were performed on Balsamo.

After retiring from the New York City Police Department on a police pension, Balsamo applied for Social Security disability benefits. Balsamo presented the reports of his orthopedic surgeon and other treating physicians as medical evidence to the ALJ. The reports stated that Balsamo was unable to perform the minimum requirements for sedentary work. The Commissioner offered into evidence the report of its orthopedic consultant, who was not one of Balsamo's treating doctors. The consulting doctor confirmed many of the findings of Balsamo's treating doctors. The consulting physician's report further stated that Balsamo could sit for up to 20–30 minutes, stand for up to 25–30 minutes, walk 2–3 blocks and lift up to twenty pounds. "The report is unclear, however, as to whether Balsamo could sit and stand/walk for repeated periods of this duration, for one period of this duration, or for smaller repeated periods totaling a period of this duration within an eight-hour day." *Balsamo*, 142 F.3d at 78.

Although finding that Balsamo's medical condition "preclude[d] him from returning to his past work activity," the ALJ concluded that Balsamo "retain[ed] the residual functional capacity for sedentary work." *Id.* at 79. The ALJ rejected the medical conclusions of Balsamo's treating physicians as to his capacity to perform sedentary work, on the basis that "[m]ost of [Balsamo's] treating physicians, since his alleged onset date, report no significant clinical findings to support their opinion that [Balsamo] is totally disabled and unable to work." *Id.* The ALJ also rejected Balsamo's "complaint of totally disabling pain [as] not ... credible to the extent alleged." *Id.* The ALJ did note, however, that Balsamo was "not homebound" because he "own[ed] and operate[d] a motor vehicle when required" and because he "continue[d] to carry a gun." *Id.*

The Second Circuit held that "the ALJ's finding that Balsamo had 'the residual functional capacity to perform the full range of sedentary work' is not supported by substantial record evidence. The Commissioner, who has the burden on the issue, failed to introduce any medical evidence that ... [Balsamo] could hold a sedentary job. To the contrary, Balsamo's treating physicians concluded that Balsamo could not sit for long periods of time and therefore could not perform sedentary work ...." *Id.* at 80.

As to the opinions of Balsamo's treating physicians, the Second Circuit opined that:

[t]he ALJ erred in rejecting the opinions of these physicians solely on the basis that the opinions allegedly conflicted with the physicians' own clinical findings. Under 20 C.F.R. § 404.1527(d)(2) ... the medical conclusion of a "treating" physician is "controlling" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." The ALJ did not give controlling weight to the opinions of [Balsamo's treating physicians], citing their alleged infrequency of treatment and alleged failure to "report ... significant clinical findings to support their opinion that the claimant is totally disabled and unable to work." The ALJ therefore apparently rejected Balsamo's treating physicians' opinions as non-controlling under § 404.1527(d)(2) because they were not "well-supported by medically acceptable clinical and laboratory diagnostic techniques."

*Id.* at 80–81. The Second Circuit further held that

the Commissioner failed to offer and the ALJ did not cite any medical opinion to dispute the treating physicians' conclusions that Balsamo could not perform sedentary work. In the absence of a medical opinion to support the ALJ's finding as to Balsamo's ability to perform sedentary work, it is well settled that "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion .... [W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him." *McBrayer*

*v. Secretary of Health and Human Servs.,* 712 F.2d 795, 799 (2d Cir.1983) (internal quotation marks and citations omitted); *see also Filocomo v. Chater,* 944 F.Supp. 165, 170 (E.D.N.Y.1996) ("In the absence of supporting expert medical opinion, the ALJ should not have engaged in his own evaluations of the medical findings.").

*Id.* at 81 (alterations in original).

As to the non-medical evidence, the Second Circuit concluded that there was no evidence that Balsamo "engaged in any of these activities for sustained periods comparable to those required to hold a sedentary job." *Id.* (quoting *Carroll v. Secretary of Health and Human Servs.,* 705 F.2d 638, 643 (2d Cir. 1983)).

■ In a decision that echoes the one in *Balsamo,* the ALJ in the present case concluded that Dr. Lehman's assessment of Bridge's marginal physical capacities and opinion of unemployability was not "controlling" pursuant to 20 C.F.R. § 404.1527(d)(2) because they were "unsupported by medically acceptable clinical and laboratory diagnostic techniques and are inconsistent with other substantial evidence." (Tr. at 18.) In reaching the determination that Bridges retained the residual functional capacity to perform sedentary work, the ALJ relied on the MRIs and the clinical findings of Dr. Lehman and Dr. Dutta. *(Id.)* The Court need not address whether Dr. Lehman's opinion bound the ALJ under the regulations because, identical to the scenario in *Balsamo,* "in this case the Commissioner failed to offer and the ALJ did not cite any medical opinion to dispute the treating physician['s] conclusions that [Bridges] could not perform sedentary work." *Balsamo,* 142 F.3d at 81. Dr. Dutta never opined that the plaintiff was capable of performing sedentary work or any type of work. Indeed, Dr. Dutta's report is silent as to the functional assessment of Bridges necessary to determine whether the plaintiff was capable of performing sedentary work. Specifically, Dr. Dutta did not note whether Bridges was capable of sitting, standing, walking, pushing, or pulling for sustained periods of time comparable to those required to hold a sedentary job. Rather, the report states in a general fashion that "[c]laimant

can stand and walk on the toes and heels and can squat without difficulty." (Tr. at 125.) Dr. Dutta merely opined that the overall prognosis was unlikely to improve significantly and that it might deteriorate over time. (Tr. at 124–25.) Although not cited and therefore, the Court assumes, not relied upon by the ALJ in reaching his decision, the record reveals two reports by the Commissioner's consulting physicians, Dr. Gowd and Dr. Lick, in 1994 and 1995, respectively, which indicate that the plaintiff was capable of performing "light" work, not sedentary work. (Tr. at 53–62, 63–69.) The Court notes that these consultant reports were prior to Dr. Lehman's 1996 assessment that the plaintiff is unable to work. In sum, no medical opinion contradicting Dr. Lehman's conclusion regarding the unemployability of the plaintiff was relied upon by the ALJ.

■ Furthermore, both parties agree that Dr. Lehman's clinical findings are consonant with those of Dr. Dutta. The plaintiff maintains that

> The ALJ rejected Dr. Lehman's opinion that Mr. Bridges was incapable of conducting work, finding Lehman's opinion unsupported by "medically acceptable clinical and laboratory diagnostic techniques and inconsistent with other substantial evidence i.e. the minimal clinical abnormalities demonstrated by the report of [consulting examiner] Dutta (tr. 18)." The ALJ not only failed to acknowledge that Dutta *confirmed* (a) Mr. Bridges' limitations with respect to sitting, standing, walking and carrying objects; (b) the presence of osteopathic degenerative disc disease as well as bulging and herniated discs; or (c) his prognosis that Mr. Bridges[ ] was unlikely to improve significantly and might deteriorate over the course of time. (Tr. 124–25) .... we believe that both doctors' Dutta and Lehman's prognosis were consistent and supported the position that Mr. Bridges was disabled.

(Pl.'s Memo in Supp. at 8–9) (emphasis added). Likewise, the Commissioner acknowledges that "Dr. Lehman's examinations disclosed no basis for plaintiff's allegations of disability other than those generally identi-

fied by Dr. Dutta." (Def.'s Memo. in Supp. at 14.) Considering that the clinical observations of the plaintiff's treating physician and the Commissioner's consulting physician do not conflict, and the absence of any medical testimony contradicting the opinion of the plaintiff's treating physician, the Court finds that the ALJ did not "choose between properly submitted opinions," but instead employed his own "expertise" in reaching his conclusion that the plaintiff was capable of performing sedentary work. "The ALJ did not question the acceptability of the techniques used by [the treating physician]. Instead, the ALJ simply evaluated the tests anew and—without citing any supporting expert testimony—reached conclusions that differed from those of [the treating physician]." *Filocomo,* 944 F.Supp. at 170. The ALJ relied on his own interpretation of the MRI results and the clinical reports of Dr. Lehman and Dr. Dutta, thus placing his "own expertise" against that of Dr. Lehman. "In the absence of supporting expert medical opinion, the ALJ should not have engaged in his own evaluations of the medical findings." *Id.*

Furthermore, the Court finds that the ALJ's citation to non-medical evidence to support his conclusion that Bridges could perform sedentary work is insufficient to meet his burden. The ALJ noted that the plaintiff's testimony of incapacitating symptomatology is "unsupported by the clinical and diagnostic evidence of record and, what is more, is incongruent with the claimant's testimony that he is able to spend much time talking on the telephone to friends and former co-workers each day and can drive an automobile to Brooklyn to visit his mother." (Tr. at 18.) As noted above, to the extent that the ALJ based this conclusion on the "clinical and diagnostic evidence," he exercised his own expertise on the subject since the two reports cited in his decision—that of Dr. Lehman and Dr. Dutta—do not support his determination. In addition, the Court takes judicial notice that individuals can talk on the telephone while lying down. *See Balsamo,* 142 F.3d at 81 (taking judicial notice that individuals can read and watch television while lying down). Furthermore, the fact that the plaintiff can occasionally drive to

Brooklyn to see his mother is not indicative of an ability to perform sedentary work. *See id.* (the plaintiff who owns and operates a motor vehicle to periodically attend church and to help his wife go shopping may, nonetheless, be unable to perform sedentary work); *see also Carroll v. Secretary of Health and Human Servs.,* 705 F.2d 638, 643 (2d Cir.1983) (sometimes reading, watching television, listening to radio, and riding the buses and the subway is not evidence that the plaintiff engaged in these activities for sustained periods comparable to those required for a sedentary job); *Murdaugh v. Secretary of Dep't of Health and Human Servs.,* 837 F.2d 99, 102 (2d Cir.1988) (plaintiff who waters garden, occasionally visits friends, and is able to get on and off an examination table was found disabled because could not perform sedentary work). Finally, "[w]hen a disabled person gamely chooses to endure pain in order to pursue important goals," such as visiting his mother, "it would be a shame to hold this endurance against him in determining benefits unless his conduct truly showed that he is capable of working." *Balsamo,* 142 F.3d at 81–82 (quoting *Nelson v. Bowen,* 882 F.2d 45, 49 (2d Cir.1989)).

In sum, the Court finds that the Commissioner has failed to sustain his burden of establishing Bridges' ability to perform sedentary work and that the ALJ's determination that Bridges could so perform is not supported by substantial evidence.

## III. CONCLUSION

Having reviewed the submissions of the parties and the case file, and for the reasons set forth above, it is hereby

**ORDERED,** that the defendant's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, is **DENIED;** and it is further

**ORDERED,** that the plaintiff's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, is **GRANTED,** to the extent that the case is remanded to the Commissioner pursuant to § 405(g) for the calculation of benefits, subject to any motion by the Commissioner for a

remand to the ALJ for the consideration of additional evidence. Any motion by the Commissioner for such relief shall served by October 13, 1998. Opposition papers, if any, shall be served by November 2, 1998. Reply papers, if any, shall be served by November 20, 1998.

**SO ORDERED.**